No. 114,271

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CHARLES NAUHEIM d/b/a KANSAS FIRE AND SAFETY EQUIPMENT,
and
HAL G. RICHARDSON d/b/a BUENO FOOD BRAND,
TOPEKA VINYL TOP and MINUTEMAN SOLAR FILM,
*Appellants*,

v.

CITY OF TOPEKA, KANSAS,
*Appellee*.

SYLLABUS BY THE COURT

1.

Where reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment is inappropriate.

2.

When a statute is plain and unambiguous, the court must give effect to its express language rather than determine what the law should or should not be.

3.

A "displaced person" as that term is used in K.S.A. 2015 Supp. 26-518(a) is any person who moves from real property as a direct result of the acquisition of such property by any condemning authority.

**4.**

When the condemning authority conditions the acquisition of real property on the property being vacant at the time of closing, the forced relocation of tenants is a direct result of the acquisition of the property by the condemning authority.

**5.**

Not every acquisition made by a condemning authority is covered by K.S.A. 2015 Supp. 26-518. In order to recover relocation benefits under K.S.A. 2015 Supp. 26-518(a), a displaced person must prove that the condemning authority either threatened or took affirmative action towards condemnation prior to the acquisition.

**6.**

Under the facts of this case, when a condemning authority mentions the option of condemnation during negotiations for the acquisition of real property, whether the condemning authority threatened condemnation action is a question of material fact which precludes the entry of summary judgment.

Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed September 2, 2016. Reversed and remanded.

*John R. Hamilton* and *David A. Brock*, of Hamilton, Laughlin, Barker, Johnson & Jones, of Topeka, for appellants.

*Shelly Starr*, chief of litigation, assistant city attorney, for appellee.

Before ARNOLD-BURGER, P.J., SCHROEDER, J., and JEFFREY E. GOERING, District Judge, assigned.

GOERING, J.:  This case pertains to whether the City of Topeka (City) is required to pay relocation benefits pursuant to K.S.A. 2015 Supp. 26-518 to two former tenants of

properties purchased from their landlord by the City in connection with a drainage project. The district court entered summary judgment in favor of the City, holding that the tenants failed to present evidence to establish (1) that they were "displaced persons" entitled to relocation expenses under the statute and (2) that the City's purchase of the land was "in advance of a condemnation action." We find that the district court erred in granting summary judgment to the City. We therefore reverse the district court's grant of summary judgment and remand the case to the district court for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

The facts relevant to this appeal are straightforward. The tenants, Charles Nauheim and Hal Richardson, leased business property in Topeka from the James D. Henderson Living Trust (landlord). Nauheim and Richardson had been long term tenants of the landlord. In connection with a drainage project, the City approached the landlord seeking to purchase the property leased by the tenants. Negotiations between the City and the landlord commenced.

During negotiations, the City made clear its desire that the property be vacant prior to the City's acquisition of title. On July 31, 2013, the City's real estate officer, Robert Kennedy, emailed the landlord saying:

> "The Deputy City Attorney is concerned that the lease will allow the tenant to stay
> beyond the 60-90 days and force the City to condemn their lease interest and force us to
> pay relocation expenses, etc. I know you are working on some kind of arrangement with
> them, so you may already have a resolution. But we will not be able to move forward
> until that lease interest is resolved."

On August 16, 2013, the City's deputy attorney, Mary Feighny, emailed the landlord advising the landlord that the City did not want to have to exercise its eminent domain power to purchase the leasehold interest of a different tenant's business should

3

that tenant refuse to relocate. On October 24, 2013, Kennedy again emailed the landlord advising, "I suppose, if we do not close this transaction, that the City will then have to condemn to get these properties. That is not a sure thing, as City management has been very reluctant to use condemnation [as] the City Council is not happy to see that going on."

Jennifer Harrell was the project engineer for the City during this time frame. Kennedy negotiated the purchase of the property under her direction. According to Harrell, acquisition of the landlord's property was contingent upon it being vacant at the time of closing.

Ultimately, the City was able to acquire the property from the landlord without exercising its power of eminent domain. The tenants were required to relocate. No federal funds were used to pay for any part of the drainage project.

The tenants filed suit against the City to recover, pursuant to K.S.A. 2015 Supp. 26-518, relocation expenses they incurred when the landlord cancelled their leases on the subject property. The parties filed competing motions for summary judgment. The district court entered summary judgment on behalf of the City, finding that the tenants failed to establish two key prerequisites for the recovery of relocation expenses under K.S.A. 2015 Supp. 26-518. First, the district court determined that the tenants were not "displaced persons" within the meaning of K.S.A. 2015 Supp. 26-518. Second, the district court found that the City did not acquire the subject property "through negotiations in advance of a condemnation action." The tenants challenge both of these legal conclusions in their timely appeal.

4

STANDARD OF REVIEW

The standard of review is well settled. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits or declarations show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." K.S.A. 2015 Supp. 60-256(c)(2).

> "The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009).

Where the material facts are uncontroverted, as they are in this case, our review to determine whether summary judgment is proper as a matter of law is unlimited. *Stroda v. Joice Holdings*, 288 Kan. 718, 720, 207 P.3d 223 (2009) (when material facts are undisputed, appellate review of the district court's grant of summary judgment is de novo). With this standard of review in mind, we now consider the issues raised by the tenants in the order they are presented.

ANALYSIS

*Are the tenants "displaced persons" within the meaning of K.S.A. 2015 Supp. 26-518?*

In their first issue on appeal, the tenants argue that the district court committed error in concluding as a matter of law that neither of them were a "displaced person" under K.S.A. 2015 Supp. 25-518. This is an issue of first impression in Kansas.

5

K.S.A. 2015 Supp. 26-518(a) states:

"Whenever federal funding is not involved, and real property is acquired by any condemning authority through negotiation in advance of a condemnation action or through a condemnation action, and which acquisition will result in the displacement of any person, the condemning authority shall:

"(a)　Provide the displaced person, as defined in the federal uniform relocation assistance and real property acquisition policies act of 1970, fair and reasonable relocation payments and assistance to or for displaced persons."

The term "displaced person" is defined in the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4601 (2012) as follows:

"(6)(A):　The term 'displaced person' means . . . :

"(i) any person who moves from real property, or moves his personal property from real property—

(I) *as a direct result* of a written notice of intent to acquire or the acquisition of such real property in whole or in part for a program or project undertaken by a Federal agency or with Federal financial assistance; or

(II) on which such person is a residential tenant or conducts a small business, a farm operation, or a business defined in paragraph (7)(D), *as a direct result* of rehabilitation, demolition, or such other displacing activity as the lead agency may prescribe, under a program or project undertaken by a Federal agency or with Federal financial assistance in any case in which the head of the displacing agency determines that such displacement is permanent." (Emphasis added.)

The parties agree that the relevant question here is whether, as a matter of law, the tenants are "displaced persons" in that their relocations were a "direct result" of the City acquiring their landlord's properties at issue. As expected, the parties disagree on the answer to that question. Resolution of this issue requires the interpretation of K.S.A. 2015 Supp. 26-518, which is a question of law subject to unlimited review on appeal.

6

*O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 331, 277 P.3d 1062 (2012). The rules of statutory interpretation are well known:

> "When a statute is plain and unambiguous, we must give effect to its express language, rather than determine what the law should or should not be. We will not speculate on the legislative intent and will not read the statute to add something not readily found in it. If the statute's language is clear, there is no need to resort to statutory construction. [Citations omitted.]" *Graham v. Dokter Trucking Group*, 284 Kan. 547, 554, 161 P.3d 695 (2007).

The City's position on this issue, and ultimately the position taken by the district court, was that the tenants were not forced to relocate from the subject property as a direct result of the acquisition of that property by the City, but rather as the result of their dealings with the landlord. In the view of the City and the district court, the tenants' relocation from the subject property was an indirect consequence of the City's acquisition of the subject property. We disagree.

The uncontroverted facts in this case establish that the City's acquisition of the subject property was contingent upon the property being vacant at the time of closing. This condition precedent for the acquisition of the property was established by the City, not the landlord. Stated another way, the City was only a willing purchaser of the subject property if the property was vacant. There was no other reason for the landlord to force the tenants to relocate from the property other than the fact that it was a necessary prerequisite for the sale of the property to the City. To suggest that the tenants' relocation from the subject property under such circumstances was an indirect result of the City's acquisition of the property is to ignore entirely the reason why the landlord forced the tenants to relocate. In this myopic view, the landlord's decision to force the tenants to relocate was independent of, or at best tangentially related to, the City's acquisition of the property, which is contrary to the summary judgment record. There is no evidence in the

7

summary judgment record to suggest that the landlord's forced relocation of the tenants was for reasons independent of the City's acquisition of the subject property.

The district court relied on *Dawson v. U.S. Dept. of Housing and Urban Development*, 428 F. Supp. 328 (N.D. Ga. 1976), in support of its ruling that the tenants' relocation was indirectly, rather than directly, the result of the City's acquisition of the subject property. *Dawson* is readily distinguishable from this case. In *Dawson*, the plaintiff, Peggy Dawson, was a tenant in an apartment complex in Atlanta, Georgia, that was sold to a private developer. Certain areas of Atlanta had been approved for urban renewal pursuant to the Neighborhood Development Programs Act, 42 U.S.C. § 1469 *et seq.*, but the apartment complex where the plaintiff resided was not in the included area. The purchaser intended to rehabilitate the building and demanded that Dawson vacate her apartment. Dawson filed suit, claiming that she was entitled to relocation benefits pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act.

The parties in *Dawson* were in agreement that a person forced to relocate as a result of the Neighborhood Development Programs Project was entitled to relocation assistance under the provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act. The parties were also in agreement that Dawson was not forced to relocate pursuant to that project. Nevertheless, Dawson argued that her displacement was the "direct result" of activities within the area approved for urban renewal pursuant to Neighborhood Development Programs Act. The court disagreed, holding:

> "Finally, the plaintiff contends that she is entitled to assistance under the Act as her dislocation was a 'direct result' of urban renewal activities under the provisions of section 4637 of the Act, to wit; the Neighborhood Development Programs Act Project. Plaintiff argues that this results from the fact that the purchase of her building outside of the Neighborhood Development Programs Project Area occurred only because the owner would not sell its buildings inside the development area without also selling those it

8

owned outside the area. The Court disagrees. Simply stated, the proximate cause of plaintiff's displacement was the decision by the owner of her apartment building to sell to a private developer. While the decision of her landlord to sell may have been influenced by the urban renewal activities in the Neighborhood Development Programs Project Area, her dislocation was not the 'direct result' of those activities. Her dislocation was not a result of the urban renewal activities but came because of a decision made by her landlord." 428 F. Supp. at 333.

In this case, the landlord sold the subject property to the City, an entity with the power of eminent domain. Further, the property at issue in *Dawson* was not in an area subject to urban renewal activities that would have entitled the tenant to benefits under the Uniform Relocation Assistance and Real Property Acquisition Policies Act. Here, the acquisition of the subject property by the City in this case was directly connected to the City's drainage project. In fact, the sole purpose of the City's acquisition of the property was for use in the drainage project.

The statutory language defining a "displaced person" is straightforward and unambiguous. A "displaced person" is any person who moves from real property as a direct result of the acquisition of such property by the City. See 42 U.S.C. § 4601(6)(A)(i)(I) (2012). Here, the City conditioned the acquisition of the subject property on the property being vacant at the time of closing. The landlord forced the tenants to vacate the subject property in order to meet this condition. The property, having been vacated by the tenants, was then acquired by the City. As such, the landlord's decision to force the tenants to vacate the property was an event that was inseparably linked to the sale of the property to the City. The uncontroverted facts in this case establish that the tenants' forced relocation from the subject property was the direct result of the City's acquisition of that property—there was no other reason that the tenants were forced to relocate. The district court's holding to the contrary was in error. The tenants are "displaced persons" as that term is defined in Uniform Relocation Assistance and Real

9

Property Acquisition Policies Act and are therefore "displaced persons" as that term is used in K.S.A. 2015 Supp. 26-518(a).

*Did the City acquire the subject property "in advance of a condemnation action"?*

Although the tenants are "displaced persons," they are not entitled to relocation benefits pursuant to K.S.A. 2015 Supp. 26-518 unless the subject property was acquired by the City "through negotiation in advance of a condemnation action." The district court determined that City did not acquire the subject property "through negotiation in advance of a condemnation action" and granted the City summary judgment. On this issue, the tenants advance two arguments: (1) that K.S.A. 2015 Supp. 26-518 does not require an "intent to condemn" by the City; and (2) assuming that there is an "intent to condemn" requirement, the material questions of fact preclude summary judgment. Each argument will be addressed in turn.

    1.    *Does K.S.A. 2015 Supp. 26-518 require a condemning authority to threaten condemnation or take steps towards condemnation?*

The district court ruled K.S.A. 2015 Supp. 26-518 required the tenants to establish that a condemning authority either took affirmative steps toward condemnation, or threatened to do so. In its written opinion, the district court reasoned:

> "[Tenants'] argument ignores the power of a condemning authority to exercise its corporate powers and acquire property without invoking eminent domain. A municipality may be able to exercise its eminent domain powers, but the existence of an option to condemn does not necessitate the conclusion that *every* real estate transaction undertaken by a municipality is 'in advance of a condemnation action.' See K.S.A. 12-101 (*Second, Fourth*).
> "According to [Tenants'] suggested reading of K.S.A. [2015 Supp.] 26-518, every negotiation conducted by a condemning authority—regardless of how the acquisition is being made—would be 'in advance of a condemnation action' simply because the

10

condemning authority holds that option *to* condemn. Put another way, under this reading, there would never be a negotiation *not* in advance of a condemnation action, and the condemning authority would have to pay relocation benefits for *every* acquisition. Such an interpretation is clearly against the legislative intent behind K.S.A. [2015 Supp.] 26-518, because the legislature added the qualified 'through negotiation in advance of a condemnation action or through a condemnation action.' Had the legislature intended a condemning authority to pay relocation benefits every time it acquired property, the legislature would not have included any such qualifying language."

On appeal, the tenants attack the district court's conclusion arguing that it belies the plain language of K.S.A. 2015 Supp. 26-518. The tenants claim that had the legislature intended to require that a condemning authority be poised to condemn, the legislature would have added that requirement to the statute. The City contends that the tenants' interpretation of K.S.A. 2015 Supp. 26-518 creates a slippery slope on which all acquisitions by a condemning authority would be subject to K.S.A. 2015 Supp. 26-518. The City argues this interpretation ignores the qualifying language of the statute—that only acquisitions "in advance of a condemnation" are covered.

To resolve this issue, we look to the plain language of K.S.A. 2015 Supp. 26-518. Not every acquisition made by a condemning authority is covered by the statute, only those acquisitions that are done "through negotiation in advance of a condemnation action or through a condemnation action." To interpret K.S.A. 2015 Supp. 26-518 in the fashion urged by the tenants, the phrase "in advance of a condemnation action" would be rendered mere surplusage. We presume that the legislature does not intend to enact useless legislation, and we are obligated to interpret a statute so that part of it does not become surplusage. *Siruta v. Siruta*, 301 Kan. 757, 763, 348 P.3d 549 (2015). We agree with the district court. In order for the tenants to establish that they are entitled to relocation benefits pursuant to K.S.A. 2015 Supp. 26-518, the tenants must prove that the City either threatened or took affirmative action towards condemnation.

2.    *Was there evidence in the summary judgment record that the City either threatened or took affirmative action towards condemnation?*

The question then becomes whether there was evidence in the summary judgment record that the City either threatened or took affirmative action towards condemnation of the subject property. On this issue, the district court held that it was uncontroverted that the City did not intend to exercise its power of eminent domain to acquire the subject property. The district court reasoned:

"The Deputy City Attorney's email specifically says, 'I *don't* want the City to have to exercise its eminent domain power . . .' (Emphasis added.) Kennedy's July 31 email can be read only one way: that the City Legal department would *not allow* the project to reach the point where they would have to use eminent domain. His October 24 email reiterates the July 31 email, and though he says, 'I suppose, if we do not close this transaction, that the City will then have to condemn to get these properties,' he immediately closes that off as a likely course.

"While it is argued that his statement is a threat of condemnation, such an argument must fail. A threat of condemnation is made to an unwilling seller in order to get them to sell—that *if* they did not sell, then the land *will be* condemned. [Citation omitted.] Here, there was a willing seller, so there is no need for a threat of condemnation. The Court finds that Kennedy's comment is nothing more than acknowledgment of the option for the Defendant City to use eminent domain, but this does not shift their negotiations to being 'in advance of a condemnation action,' as no threat was made. The Court further finds that reasonable minds could not differ as to the conclusion that the emails exchanged between City staff and Landlord contained no threat to exercise the Defendant City's eminent domain powers."

As noted above, in ruling on a summary judgment motion "[t]he trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought." *Shamberg*, 289 Kan. at 900. In addition, the court should resist the temptation to "pass on credibility and to balance and weigh evidence," which are proper functions for the factfinder at trial.

12

*Mastin v. Kansas Power & Light Co.*, 10 Kan. App. 2d 620, 624, 706 P.2d 476 (1985). "In short, '[s]ummary judgment should not be used to prevent the necessary examination of conflicting testimony and credibility in the crucible of a trial.'" 10 Kan. App. 2d at 624. We do not think that the district court viewed the summary judgment record consistent with this standard.

The summary judgment record included an affidavit from the landlord who averred: "Through conversations with at least two representatives, the City of Topeka indicated to Affiant that if negotiations failed, the City would then have to condemn the properties." Thus, from the landlord's perspective, the email communication from the City indicated to him that the subject property would be condemned if negotiations failed. That is a reasonable interpretation given the language of the emails. In the August 16, 2013, email, the Deputy City Attorney stated: "I don't want the city to have to exercise its eminent domain power to purchase the leasehold interest of Auto Acceptance should the latter refuse to move to its new location." In the October 24, 2013, email, the City's real estate officer stated: "I suppose, if we do not close this transaction, that the City will then have to condemn to get these properties."

The district court focused its attention on the qualifying language in the email exchanges that suggested the City viewed condemnation as a less attractive method to acquire the subject property. However, we cannot conclude from this language that the City was taking the option of condemnation entirely off the table. If that were the case, there would have been no reason for representatives of the City to mention the option of condemnation in the first place. The email communications at issue were exchanged during negotiations for the acquisition of the subject property. The City clearly intended for the landlord to be aware that it had the option of condemnation if the City was not able to acquire the subject property through negotiation. Whether that constitutes a threat of condemnation is a question of fact that is for the trier of fact. Certainly the landlord,

13

who was on the receiving end of these communications, had the understanding that if negotiations failed the City would have to condemn the property.

We find that reasonable minds could conclude from the emails exchanged that the City intended to acquire the subject property by condemnation if it could not acquire the property through negotiation. "[W]here we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." *Shamberg*, 289 Kan. at 900. Because genuine issues of material fact remain as to whether the City acquired the subject property through negotiations in advance of a condemnation action, the district court committed error when it granted the City summary judgment. Accordingly, we reverse the grant of summary judgment to the City and remand the case to the district court for further proceedings consistent with this opinion.

Reversed and remanded.