IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,521

HEARTLAND APARTMENT ASSOCIATION, INC., *et al.*,
*Appellants/Cross-appellees*,

v.

CITY OF MISSION, KANSAS,
*Appellee/Cross-appellant.*

SYLLABUS BY THE COURT

1.

A tax is a forced contribution to pay for the government's general services, that is, services that benefit the members of the public at large, regardless of whether any particular person has paid the tax. A fee, on the other hand, is not a revenue measure. It is assessed against those who gain the exclusive benefit of the service or, if a regulatory fee, those who are the subject of the regulation.

2.

An excise tax is a tax imposed on performance of an act, engagement in an occupation, or enjoyment of a privilege. The Transportation User Fee, or TUF, adopted by the City of Mission is a tax on real property owners based on the use of their property, rather than a tax on the property itself. As such, it is a tax on the enjoyment of a privilege, and it qualifies as a prohibited excise tax under K.S.A. 2016 Supp. 12-194.

Review of the judgment of the Court of Appeals in 51 Kan. App. 2d 699, 352 P.3d 1073 (2015). Appeal from Johnson District Court; JAMES F. VANO, judge. Opinion filed April 7, 2017. Judgment of the

1

Court of Appeals reversing and remanding to the district court is affirmed. Judgment of the district court is reversed and remanded with directions.

*Mary Jo Shaney*, of White Goss, a Professional Corporation, of Kansas City, Missouri, argued the cause, and *James C. Bowers, Jr.*, *Daniel P. Goldberg*, and *Bryant E. Parker*, of the same firm, were with her on the briefs for appellants/cross-appellees.

*Thomas V. Murray*, of Lathrop & Gage LLP, of Overland Park, argued the cause, and *Mark A. Samsel*, of the same firm, was with him on the briefs for appellee/cross-appellant.

*Athena E. Andaya*, deputy attorney general, for *amicus curiae* Office of Kansas Attorney General.

*John A. Donley*, of Devine and Donley, LLC, of Topeka, for *amicus curiae* National Federation of Independent Business Small Business Legal Center.

*Lucas Bell*, of Topeka, for *amicus curiae* Kansas Association of Realtors.

The opinion of the court was delivered by

BEIER, J.:  In 2010, the City of Mission passed a Transportation User Fee (TUF). The TUF is assessed on all developed real property based on a formula that attempts to estimate the number of vehicle "trips" a particular property generates. The revenue raised by the TUF, according to the enacting ordinance, is used for maintenance and upkeep of Mission's streets.

Plaintiffs Heartland Apartment Association, Inc., an association whose members own or operate multifamily retail housing; Building Owners and Managers Association of Metropolitan Kansas City, an association whose members own commercial buildings; and several individual owners of developed property challenged the TUF as an impermissible excise tax levied by Mission in violation of K.S.A. 2016 Supp. 12-194.

2

The district court judge granted summary judgment to Mission. On appeal, a panel of the Court of Appeals reversed, holding that the TUF is an impermissible excise tax under K.S.A. 2016 Supp. 12-194. We granted Mission's petition for review.

For the reasons outlined below, we affirm the decision of the Court of Appeals and reverse the judgment of the district court.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2010, Mission's City Council adopted Ordinance No. 1332, which established the TUF and created a "transportation utility" "for the purpose of maintenance of City streets." Mission City Code §145.030. The ordinance "imposed and levied" the TUF on "the owners of all developed property within the City of [Mission]." Mission City Code §145.070. The ordinance does not cover real property exempt from taxation under K.S.A. 79-201 (exempting religious, educational, similar property from all property, ad valorem taxes). Mission City Code §145.071.

The TUF is based on the "direct and indirect use of or benefit derived from the use of public streets, bicycle lanes and sidewalks generated by the developed property." Mission City Code §145.070. It identifies three basic factors to be used in determining the amount of the fee:

"1. The developed use of the property which includes the amount of vehicular traffic generated by the property, as determined by [Mission's] City Administrator.

"2. For non-residential uses the developed square footage on the property or parcel.

3

"3. The traffic generation factor for each use category of developed property." Mission City Code §145.080A.

To calculate the fee, the ordinance requires the use of "Trip Generation, 8th Edition, published by the Institute of Transportation Administrators ('ITE Manual')," Mission City Code §145.020D, and outlines the following procedure:

"[Mission's] City Administrator shall determine the category of use from the ITE Manual that shall apply to each developed lot or parcel within the City [of Mission]. In the absence of a specific use category from within the ITE Manual for a particular developed use, [Mission's] City Administrator shall determine the appropriate category by interpreting the ITE Manual and assigning the category which most accurately reflects the traffic generated by the particular developed use. After determining the appropriate use category for a developed parcel, [Mission's] City Administrator shall use the estimated vehicle trip generation figures for the assigned use category from the ITE Manual to compute an estimate of annual trips related to the parcel and assign the parcel to a group of similarly used properties ('customer group')." Mission City Code §145.080B.

The three customer groups are: single-family residential, multi-family residential, and non-residential use. Mission City Code §145.080B.

The ordinance does not set out the charge to be assessed, instead leaving that to "be as fixed from time to time in [Mission's] annual budget." Mission City Code §145.080D. The billing and collection of the fee is accomplished in conjunction "with ad valorem real estate taxes annually." Mission City Code §145.090.

Mission's TUF Administrative Manual provides further details about the calculation of the fee. The 2012 manual is included in the record on appeal. According to this version of the manual, the TUF that is actually assessed depends on five factors:

4

"1. That property's estimated trip generation over a period of time.

"2. A split trip rate that includes a 1-cent base charge and a differentiated commercial and residential property component. The residential per trip rate is 2.076 cents and the commercial per trip rate is 1.490 cents.

"3. Special consideration is given for specific trip generation data that better refines or defines the trips a particular land use generates.

"4. The jurisdiction's total annual transportation funding requirement.

"5. The share of that budget to be generated through the TUF system versus other sources."

The manual also contains Land Use classification data from the ITE Manual for all property in Mission. The data is broken down into various categories, such as "Animal Hospital/Vet Clinic," "Fast-Food Restaurant (w/Drive-through Window)," "Gasoline/Service Station with Convenience Market and Car Wash," and "Gasoline/Service Station with Convenience Market." Each classification includes data such as the average trips generated each day of the week and the total weekly trips for a particular usage. The per-day and per-week trips are based on a unit that varies, depending on the use. For example, an animal clinic's trip generation is based on 1000 square feet gross floor area, a hotel on its number of rooms, and a gas station on "vehicle fueling positions."

In March 2012, plaintiffs filed suit against Mission, seeking a declaratory judgment and preliminary and permanent injunctions. Plaintiffs had paid the TUF in 2010 in amounts ranging from $72.00 to $16,159.87.

5

Specifically, plaintiffs asserted five claims in district court. In Claim I, the two associations asked for a declaratory judgment that the TUF was an impermissible excise tax violating K.S.A. 2016 Supp. 12-194 and that Mission must stop "assessing, billing, and collecting the TUF"; return fees "collected illegally with pre- and post-judgment interest"; and pay the associations' reasonable attorney fees and costs. In Claim II, the individual plaintiffs sought the same relief as the associations had sought in Claim I. In Claim III, plaintiffs asked for both a preliminary and a permanent injunction to prevent Mission from enforcing the TUF and for an order requiring Mission to reimburse plaintiffs for TUF amounts they had already paid, to pay pre- and post-judgment interest, and to pay plaintiffs' reasonable attorney fees and costs. In Claim IV, the individual plaintiffs asked the district court to order Mission to reimburse each individual plaintiff for the TUF amount each had paid in 2010 and 2011, including interest, attorney fees, and costs. In Claim V, plaintiffs alleged due process and equal protection violations because Mission "has enacted an illegal and discriminatory tax, has treated similarly situated persons and entities differently without a rational basis, and has infringed on the political power and privileges of property owners in the City of Mission, Kansas."

The individual plaintiffs and Heartland filed a motion for summary judgment on Claims I, II, and III. Mission filed its own motion for summary judgment against all plaintiffs on all claims.

After reviewing the motions and supporting memoranda, the district judge issued his memorandum decision granting summary judgment to Mission and denying summary judgment to plaintiffs.

The judge began his analysis with acknowledgment of Mission's constitutional "home rule" power to determine its local affairs, including "'the levying of taxes[,] excises, fees, charges and other exactions except when . . . limited or prohibited by

enactment of the legislature applicable uniformly to all cities of the same class.'" He then noted that under K.S.A. 2016 Supp. 12-194, "'no city or county shall levy or impose an excise tax or a tax in the nature of an excise'" and that the "substance of both Motions is whether the TUF is an unlawful excise tax."

The judge next addressed whether the TUF qualified as a fee or a tax, concluding that it is a tax, based on the definitions used in Kansas.

> "The TUF is not voluntary—all property owners generally must pay it. The citizens who pay the TUF do not receive any special benefit for it. There is no aspect of contract or consent in payment of the fee. The money raised from the TUF is used to pay for street improvements, which are used by all. And the TUF is not a way to *compensate* the government for regulating a specific service, benefit, or privilege."

The judge then turned to the question of whether the TUF further qualified as an excise tax. Relying on Kansas caselaw that had defined an "excise tax" as one "'imposed on the performance of an act, the engaging in an occupation or the enjoyment of a privilege,'" the district judge concluded that the TUF is not an excise tax. According to the judge, "Mission determines the charge for the tax based on the estimated number of trips a property generates. Clearly, residents of Mission are not charged based on the actual performance of any act, engaging in an occupation, or the enjoyment of a particular privilege."

The judge concluded that the "TUF, as it was enacted, was within City of Mission's home rule authority and does not offend the legislative limitation upon that power." Based on his determination that the TUF is not an illegal excise, the district judge deemed plaintiffs' due process claim irrelevant and its equal protection claim without merit. Plaintiffs moved to amend the district judge's memorandum decision, and the judge denied the motion.

7

Plaintiffs then appealed, raising four issues: (1) whether the TUF is an impermissible excise tax; (2) whether Mission exceeded its powers by passing the TUF through enactment of an ordinary ordinance; (3) whether the district judge erred by granting summary judgment on plaintiffs' due process, equal protection, and reimbursement claims on controverted or unconsidered facts; and (4) whether the district judge abused his discretion in denying Plaintiffs' Motion to Amend. Mission filed a cross-appeal, raising one issue: whether the TUF is a special fee rather than a tax, under Kansas law.

The reviewing Court of Appeals panel analyzed two issues. First, the panel addressed whether the TUF is a tax. The panel dismissed decisions from other jurisdictions that had analyzed municipal exactions similar to the TUF as shedding "little light on this dispute." *Heartland Apartment Ass'n v. City of Mission*, 51 Kan. App. 2d 699, 707, 352 P.3d 1073 (2015), *rev. granted* 303 Kan. 1077 (2016). Relying primarily on this court's decision in *Executive Aircraft Consulting, Inc. v City of Newton*, 252 Kan. 421, 845 P.2d 57 (1993), the panel concluded that the TUF is a tax because it "is an annual forced contribution from all improved real estate owners that is used for the maintenance of a government service available to the general public." 51 Kan. App. 2d at 708.

The panel then turned to the question of whether the TUF is an impermissible excise tax under K.S.A. 2016 Supp. 12-194. Through a 2006 amendment to the statute, the panel said "the legislature has enlarged what taxes are prohibited to such an extent that [the TUF] can be no other tax than an excise tax and is thus prohibited by law," and it "is clearly assessed, in part, on how property owners decide to use their property." 51 Kan. App. 2d at 713, 717. Because it is an excise tax and does not fit any of the

exceptions listed in K.S.A. 2016 Supp. 12-194, the panel ruled, Mission exceeded its home rule authority in enacting the TUF. 51 Kan. App. at 717-18.

The panel declined to address plaintiffs' due process and equal protection arguments. 51 Kan. App. 2d at 718. It also declined to address plaintiffs' arguments raised after the district judge had ruled on the motions for summary judgment. 51 Kan. App. 2d at 718.

Mission petitioned this court for review of three aspects of the panel's opinion: 1) the TUF's categorization as an impermissible excise tax; 2) determination of the correct standard of review for challenges to a City's tax measure enacted under its home rule authority; and 3) the advisability of Kansas recognition of a "special fee." We granted review.

DISCUSSION

To resolve this appeal, we must answer only two questions:  Is the TUF a tax? And, if so, is it a prohibited excise tax under K.S.A. 2016 Supp. 12-194? Because we ultimately answer both questions yes, no other issues need be examined. Plaintiffs' should have prevailed as a matter of law on their motion for summary judgment.

*Standard of Review*

An appellate court's standard of review on summary judgment is well known:

> "'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is

9

sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]' *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009)." *Fawcett v. Oil Producers, Inc. of Kansas*, 302 Kan. 350, 358-59, 352 P.3d 1032 (2015).

The parties agree that there are no factual disputes, and our review is unlimited. *David v. Hett*, 293 Kan. 679, 682, 270 P.3d 1102 (2011). And, to the extent this court is required to interpret or construe the language of K.S.A. 2016 Supp. 12-194, such issues raise questions of law subject to unlimited review. *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 331, 277 P.3d 1062 (2012). When a statute is plain and unambiguous, the court does not speculate about legislative intent. *City of Dodge City v. Webb*, 305 Kan. 351, 356, 381 P.3d 464 (2016). Only where a statute's language is unclear or unambiguous does the court rely on canons of construction or other tools to construe the legislature's intent. *City of Dodge City*, 305 Kan. at 356.

Two other considerations are worth noting.

First, Article 12, § 5 of the Kansas Constitution, commonly referred to as the Home Rule Amendment, grants cities the power of home rule "to determine their local affairs and government." Moreover, the "[p]owers and authority granted cities pursuant to this section shall be liberally construed for the purpose of giving to cities the largest measure of self-government." Kan. Const. art. 12, §5(d). Because of this, a city's ordinance is "entitled to a presumption of validity and should not be stricken unless its infringement upon a statute is clear beyond substantial doubt." *Executive Aircraft*, 252 Kan. at 424.

10

"This provision simply means that the home rule power of cities is favored and should be upheld unless there is a sound reason to deny it. Where the legislature has acted in some area[,] a city's power to act in the same area should be upheld unless the legislature has clearly preempted the field so as to preclude city action. Unless there is actual conflict between a municipal ordinance and a statute, the city ordinance should be permitted to stand." *Claflin v. Walsh*, 212 Kan. 1, 7, 509 P.2d 1130 (1973).

Second, tax statutes must be strictly construed, and if there is reasonable doubt as to the statute's meaning, it must be construed in favor of the taxpayer. *Executive Aircraft*, 252 Kan. at 425.

In *Executive Aircraft*, this court was faced with similar interplay between the deference given to municipal ordinances and strict construction of tax enactments. The court ultimately concluded that "[a]ny reasonable doubt concerning the meaning of these tax statutes must be construed in favor of the taxpayer, not the municipality." 252 Kan. at 425.

*Is the TUF a Tax?*

The Home Rule Amendment provides:

"Cities are hereby empowered to determine their local affairs and government including the levying of taxes, excises, fees, charges and other exactions except when and as the levying of any tax, excise, fee, charge or other exaction is limited or prohibited by enactment of the legislature applicable uniformly to all cities of the same class." Kan. Const. art. 12, § 5(b).

Under the Home Rule Amendment, if the legislature "has spoken through a statute with statewide effect," a city may opt out of the enactment by charter ordinance, "which

is subject to more rigorous notice requirements and public challenge not applicable to ordinary ordinances." *Farha v. City of Wichita*, 284 Kan. 507, Syl. ¶ 3, 161 P.3d 717 (2007). But there are four types of statutes that a city may not opt out of: "(1) enactments of statewide concern uniformly applicable to all cities; (2) other enactments uniformly applicable to all cities; (3) enactments uniformly applicable to all cities of the same class *that prohibit or limit the levying of any tax, excise, fee, charge, or other exaction*; and (4) enactments prescribing limits of indebtedness." (Emphasis added.) 284 Kan. 507, Syl. ¶ 4.

The legislature has enacted several limitations on a city's ability to levy taxes. See, *e.g.*, K.S.A. 12-140 (cities generally prohibited from levying, collecting income tax). In addition to these statutory prohibitions, the "uniform and equal basis of valuation" clause of Article 11, § 1(b) of the Kansas Constitution limits the manner in which property taxes can be levied and assessed. This provision "requires the legislature to provide for uniformity in the basis of assessment as well as in the rate of taxation. Uniformity in taxing implies equality in the burden of taxation." *State ex rel. Stephan v. Martin*, 227 Kan. 456, 461, 608 P.2d 880 (1980).

Of dispositive importance to this case is K.SA. 2016 Supp. 12-194(a), which states that

"no city or county shall levy or impose an *excise tax or a tax in the nature of an excise*, other than a retailers' sales tax and a compensating use tax." (Emphasis added.)

The statute also lists five specific exceptions, such as contracts with a utility for a fixed charge, none of which is relevant to this case.

Given the language of the statute, the threshold question on whether K.S.A. 2016 Supp. 12-194 applies is therefore whether the TUF is a tax at all. We thus turn to the way the word "tax" is understood and employed.

Black's Law Dictionary defines "tax" as:

"A charge, usu. monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue. Most broadly, the term embraces all governmental impositions on the person, property, privileges, occupations, and enjoyment of the people, and includes duties, imposts, and excises. Although a tax is often thought of as being pecuniary in nature, it is not necessarily payable in money." Black's Law Dictionary 1685 (10th ed. 2014).

This court has recognized that a "tax is a forced contribution to raise revenue for the maintenance of government services offered to the general public." *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 264 Kan. 363, Syl. ¶ 5, 956 P.2d 685 (1998).

In addition, the distinction between a tax and a fee was discussed at length in *Executive Aircraft*, including a survey of the caselaw of many jurisdictions. In that case, Executive Aircraft Consulting filed a declaratory judgment action against the City of Newton and Harvey County, challenging the legality of a "fuel flowage fee." 252 Kan. at 422. In holding in favor of Executive Aircraft, the *Executive Aircraft* court noted that the United States Supreme Court had defined a tax as an "'enforced contribution to provide for the support of government.'" 252 Kan. at 426 (quoting *United States v. Mississippi Tax Comm'n*, 421 U.S. 599, 606, 95 S. Ct. 1872, 44 L. Ed. 2d 404 [1975]). In contrast, a "'fee . . . is incident to a voluntary act . . . which, presumably, bestows a benefit on the applicant, not shared by other members of society.'" *Executive Aircraft*, 252 Kan. at 426 (quoting *National Cable Television Assn. v. United States*, 415 U.S. 336, 340-41, 94 S.

13

Ct. 1146, 39 L. Ed. 2d 370 [1974]). According to the District of Columbia Court of Appeals: "'A "fee" is a payment for a special privilege or service rendered, and not a revenue measure. If the "fee" unreasonably exceeds the value of the specific services for which it is charged[,] it will be held invalid.'" *Executive Aircraft*, 252 Kan. at 426 (quoting *National Cable Television Ass'n, Inc. v. F.C.C.*, 554 F.2d 1094, 1106 [D.C. Cir. 1976]). In Kentucky "'"any payment exacted by the state or its municipal subdivisions as a contribution toward the cost of maintaining governmental functions, where the special benefits derived from their performance is merged in the general benefit, is a tax." On the other hand, a fee is generally regarded as a charge for some particular service.'" *Executive Aircraft*, 252 Kan. at 427 (quoting *Dickson, Sheriff v. Jeff. Co. Bd. of Education*, 311 Ky. 781, 786, 225 S.W.2d 672 [1949]).

Based on these definitions and others the court concluded:

"Thus, a tax is a forced contribution to raise revenue for the maintenance of governmental services offered to the general public. In contrast, a fee is paid in exchange for a special service, benefit, or privilege not automatically conferred upon the general public. A fee is not a revenue measure, but a means of compensating the government for the cost of offering and regulating the special service, benefit, or privilege. Payment of a fee is voluntary—an individual can avoid the charge by choosing not to take advantage of the service, benefit, or privilege offered." 252 Kan. at 427.

Kansas law further recognizes a subset of taxes called special assessments or, as sometimes referred to, special taxes. We have noted that

"'[a] distinction exists between general taxes and assessments for special or local improvements. The former are exactions placed upon the citizens by the taxing authorities for the support of the government while the latter are imposed upon property within a limited area for payment of special or local improvements.' [Citation omitted.]

14

. . . .

> "'The foundation of the power to make a special assessment for a local improvement of any character, including the construction of a sanitary sewer system, is that the property against which the assessment is levied *derives some special benefit from the improvement*.' [Citation omitted.]" (Emphasis added.) *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, 516, 930 P.2d 1366 (1997).

See also Black's Law Dictionary 140 (10th ed. 2014) ("special assessment" defined as assessment of tax on property that benefits in some important way from public improvement).

In *Mount Hope Cemetery Co. v. City of Topeka*, 190 Kan. 702, 707, 378 P.2d 30 (1963), this court relied on the United States Supreme Court's decision in *Illinois Central Railroad Co. v. Decatur*, 147 U.S. 190, 13 S. Ct. 293, 37 L. Ed. 132 (1893), to distinguish between general taxes and special assessments. The Supreme Court noted that "special assessments or special taxes proceed upon the theory that *when a local improvement enhances the value of neighboring property that property should pay for the improvement*." (Emphasis added.) 147 U.S. at 198. Moreover,

> "[s]pecial assessments, on the other hand, are made upon the assumption that a portion of the community is to be specially and peculiarly benefited, in the enhancement of the value of property peculiarly situated as regards a contemplated expenditure of public funds; and, in addition to the general levy, they demand that special contributions, in consideration of the special benefit, shall be made by the persons receiving it. The justice of demanding the special contribution is supposed to be evident in the fact that the persons who are to make it, while they are made to bear the cost of a public work, are at the same time to suffer no pecuniary loss thereby, their property being increased in value by the expenditure to an amount at least equal to the sum they are required to pay." 147 U.S. at 199.

This court has also discussed the distinction between taxes and fees, at least tangentially, in relation to regulatory fees demanded by administrative agencies.

In *Panhandle Eastern Pipe Line Co. v. Fadely*, 183 Kan. 803, 804, 332 P.2d 568 (1958), this court discussed legislation ordering the State treasurer to transfer $100,000 from the "natural gas conservation fund of the state corporation commission to the state general revenue fund." The state corporation commission had been authorized to levy assessments to "pay the conservation division expenses and other costs in connection with the administration of the gas conversation laws," and the plaintiff argued that the transfer was "an attempt to raise revenue under the guise of the police power," which, among other things, violated Article 11, §§ 1 and 5 of the Kansas Constitution. 183 Kan. at 805-06.

The court said that it was "clear that under its police power the state may reimburse itself for the costs of otherwise valid regulation and supervision by charging the necessary expenses to the businesses or persons regulated." 183 Kan. at 806. But, if a statute "shows on its face that some part of the exaction is to be used for a purpose other than the legitimate one of supervision and regulation . . . or if more than adequate remuneration is secured," it is void. 183 Kan. at 806-07. The court ruled that such a transfer might be justified if it reimbursed other departments or state agencies for indirect aid given to the regulating agency, but the legislation in question had no such purpose and transferred the funds to the general fund of the state without any limitation. 183 Kan. at 807-08. It was therefore void. 183 Kan. at 808.

> "When a regulatory measure openly becomes a revenue enactment, that portion thereof which exacts revenue fails as a valid exercise of the police power. We are of the opinion [that the legislation in question] *amount*[*s*] *to a tax and a revenue measure levied*

16

*under the guise of a regulatory fee*, and violate[s] article 11, section 1 of our state constitution, the commerce clause and the Fourteenth Amendment of the Federal constitution." (Emphasis added.) 183 Kan. at 808.

Against this backdrop, the distinction between a tax and fee comes into sharp relief. In determining whether an exaction is a tax or fee, the primary considerations are: Who is paying? Who is benefiting? and What will the revenue be used for?

A tax is a forced contribution to pay for the government's general services, that is, services that benefit the members of the public at large, regardless of whether any particular person has paid the tax. A tax is a "general tax" or a "special tax" (or "special assessment") depending on whether those paying the tax receive a special benefit in addition to the general benefit available to everyone. A general tax bestows no special benefit to anyone. In contrast, a special tax is premised and justified on the assumption that the taxpayer will realize a specific and cognizable benefit—typically, an increase in property value—beyond that realized by members of the general population. Because a special tax requires such a benefit, its revenues will be allocated to a very specific purpose. In fact, the purpose will likely be for "special or local *improvements*." See *Mount Hope Cemetery*, 190 Kan. at 708. For example, a special assessment may be exacted against the owners of property to pay for paving an abutting street. See, *e.g.*, 190 Kan. at 708 (cemetery abutting street undergoing paving improvement, including curbing and guttering, requires payment of special assessment). The general public often will be a secondary beneficiary of a special assessment, as in the case of road paving.

A fee, on the other hand, is not a revenue measure. It is assessed against those who gain the exclusive benefit of the service or, if a regulatory fee, those who are the subject of the regulation. In other words, an exaction is a fee when the benefits are not enjoyed

17

by the public at large. As noted in *Executive Aircraft*, fees are voluntary in nature in that a person can decline to take advantage of the service or benefit.

Applying the law reviewed above, we have no hesitation in classifying the TUF as a tax. It is levied against the owners of all developed property in Mission. Although the revenue generated from the tax is earmarked for maintenance of city streets, the TUF is still a general revenue measure, *i.e.*, it is not for specific improvements nor does it compensate Mission for the costs of administering a special service. To the extent that those who pay the TUF benefit from the governmental service the TUF funds, the benefit is of a general nature and shared with the public at large. Finally, the TUF is not voluntary, which is a requirement for a fee under *Executive Aircraft*. 252 Kan. at 427. Rather, the TUF "is a forced contribution to raise revenue for the maintenance of governmental services offered to the general public." 252 Kan. at 427.

Throughout this case, Mission has argued that the TUF is most comparable to stormwater or sewer utility fees. But this comparison fails, as those fees are for services actually rendered. See *Jennings v. Walsh*, 214 Kan. 398, 401, 521 P.2d 311 (1974) ("Generally speaking, sewer charges by a municipality must be [tied] to the use of the services and the fee imposed, under most authorities is not a tax, but a charge for services rendered."); see also *Regency Park v. City of Topeka*, 267 Kan. 465, 472, 981 P.2d 256 (1999) (recognizing difference in handling of stormwater, sewage; payment for handling of either not characterized as tax; both in nature of "tolls or rents" paid for services actually furnished). Because both charges are for services rendered, they satisfy the *Executive Aircraft* definition of a fee.

To the extent Mission may argue that the TUF is akin to stormwater or sewer utility fees because it is based on "services rendered" in the form of provision of roads for car trips, such an argument also fails. Although the TUF is assessed based on the number

18

of trips a property generates, it is not assessed against those that are *actually using* the road. It is not a payment from motorists, which could properly be characterized as a fee. We also note that use of a toll road is *voluntary*; a motorist can choose an alternative route or even an alternative mode of transportation, such as walking. In contrast, the TUF cannot be avoided by the owner of developed property.

Mission's fallback argument is that the court should consider adopting another category of exaction: a special fee. A "special fee" would share characteristics of both a tax and a fee and would presumably not violate the prohibition on excise taxes. Mission "suggests that the *Executive Aircraft* test should be reevaluated to incorporate more recent developments in the law, such as the TUF, special fees, service fees, stormwater fees, or solid waste fees, none of which *Executive Aircraft* addressed."

Mission relies on *Bloom v. City of Fort Collins*, 784 P.2d 304 (Colo. 1989), to support the adoption of this new category. In *Bloom* the Colorado Supreme Court addressed the validity of Fort Collins' "'transportation utility fee'" in light of a challenge that it violated the Colorado Constitution's requirement of property tax uniformity. 784 P.2d at 304. If the Fort Collins TUF was held to be a property tax, it would be struck down as unconstitutional. 784 P.2d at 305.

At the outset of its analysis, the Colorado Supreme Court identified four types of revenue-generating measures available to Colorado municipalities that might cover the Fort Collins TUF: an ad valorem tax, an excise tax, a special assessment, and a special fee. The court then outlined the general properties of each under Colorado law. See 784 P.2d at 307-10. With that framework in mind, the court discussed the TUF and attempted to categorize it.

19

First, the court rejected the notion the Fort Collins TUF was an ad valorem property tax because such a tax must be assessed on the value of the property being taxed. Second, the court determined that the TUF was not an excise tax either, because, to be an excise tax, the "tax itself [must be] made a condition precedent to [an] act, event, or occurrence." 784 P.2d at 310. Third, the court eliminated the possibility that the TUF qualified as a special assessment, because the ordinance did not require revenue raised by the TUF to be used to pay for improvements benefitting a particular property. Fourth, the court defined a special fee as "a charge imposed on persons or property and reasonably designed to meet the overall cost of the service for which the fee is imposed." 784 P.2d at 310.

As to the TUF before it, the court noted that the "owners and occupants of developed lots subject to the fee receive the benefit of a program of city maintenance calculated to provide effective access to and from residences, buildings, and other areas within the city." 784 P.2d at 310. Although another method for raising the funds could have been chosen and the class of persons liable for the fee could have been broader, the availability of such options did not invalidate the ordinance, and the TUF was a valid special fee. 784 P.2d at 310. Although the court acknowledged that "the transportation utility fee is not conditioned on the voluntary choice of owners or occupants of developed lots," it had never held "that a service fee must be voluntary. 784 P.2d at 310.

We reject Mission's invitation to adopt a new category of a special fee based on *Bloom*'s example. On close examination, we are convinced that most assessments Colorado refers to as "special fees" would already be considered "fees" in Kansas' current framework.

The *Bloom* court distinguished special fees from taxes because "a special fee is not designed to raise revenues to defray the general expenses of government, but rather is a

charge imposed upon persons or property for the purpose of defraying the cost of a particular governmental service. . . . The amount of a special fee must be reasonably related to the overall cost of the service." 784 P.2d at 308. In Colorado, a special fee generally will be upheld if "the ordinance is reasonably designed to defray the cost of the particular service rendered by the municipality." 784 P.2d at 308 (citing cases upholding sewage service fee, annual emergency medical services fee, fee assessed on rental property to defray costs of administering hearings to resolve rental disputes, storm drainage service charge, building permit fees.) A special fee may be invalidated "when the principal purpose of the fee is to raise revenues for general municipal purposes rather than to defray the expenses of the particular service for which the fee is imposed." 784 P.2d at 308.

We also reject Mission's invitation to mimic *Bloom* because in its discussion of special fees, use for a governmental "service" seems to distinguish only between revenue allocated to a general fund and revenue allocated to a specific fund, such as road maintenance. Taken to its logical extreme, any revenue measure might be a "special fee" in Colorado if it is earmarked to pay for a specific governmental function. This is much broader than what has been contemplated under Kansas law, and we do not wish to expand the Kansas concept of fee today.

Finally, we observe that our conclusion that the TUF is a tax is consistent with the results of several other jurisdictions that have addressed TUF-like exactions. See *State v. City of Port Orange*, 650 So. 2d 1 (Fla. 1994) (considering transportation utility fee as tax); *Brewster v. City of Pocatello*, 115 Idaho 502, 768 P.2d 765 (1988) ("street restoration and maintenance fee" assessed against all owners and occupants of property within city qualifies as tax); *Covell v. City of Seattle*, 127 Wash. 2d 874, 905 P.2d 324 (1995) (classifying monthly "street utility" fee as tax). These decisions reinforce our decision.

21

*Is the TUF an Excise Tax?*

As noted above, K.S.A. 2016 Supp. 12-194(a) prohibits all excise taxes with certain exceptions. The exceptions for retailers' sales taxes and compensating use taxes are broad while five enumerated exceptions are more narrow and detailed. The parties agree that the TUF is not a retailers' sales tax or compensating use tax and does not meet one of the enumerated exceptions. Simply, if Mission's TUF is an excise tax, it is prohibited by K.S.A. 2016 Supp. 12-194.

"Excise tax" is not an expressly defined statutory term, and its meaning is not so plain that construction is unnecessary. See *City of Dodge City v. Webb*, 305 Kan. 351, 356, 381 P.3d 464 (2016). We thus turn to other sources to discern its meaning.

In *Callaway v. City of Overland Park*, 211 Kan. 646, 508 P.2d 902 (1973), this court interpreted a previous version of K.S.A. 12-194 (then K.S.A. 1971 Supp. 79-4424). And the parties and the Court of Appeals panel have relied heavily on *Callaway* in interpreting the current version of the statute. To put current statutory language and *Callaway* into context, we must discuss the history of K.S.A. 12-194 and related statutes.

The Home Rule Amendment was adopted by vote of the people and became effective on July 1, 1961. 211 Kan. at 648. That amendment gave cities broad powers in levying taxes and fees, among other things. Those powers, however, could be limited by legislative enactment. The legislature immediately exercised its power of limitation by enacting G.S. 1961 Supp. 12-139, 12-140, and 12-141.

G.S. 1961 Supp. 12-139 provided: "No city shall impose an excise tax, or tax in the nature of an excise, upon a sale or transfer of personal or real property, or the use

22

thereof, or the rendering or furnishing of a service." G.S. 1961 Supp. 12-140 prohibited cities from levying taxes on income. G.S. 1961 Supp. 12-141 listed two exceptions to the prohibited taxes. The first exception allowed contracting with a utility for a fixed charge, and the second exception allowed license fees on the privilege of doing business. The legislature also outlined procedures for a city to exercise its home rule taxing powers in G.S. 1961 Supp. 12-137.

K.S.A. 12-194's 1961 predecessor thus prohibited only a subset of excise taxes: those "upon a sale or transfer of personal or real property, or the use thereof, or the rendering or furnishing of a service." G.S. 1961 Supp. 12-139. Notably, this narrow statute appears to have prohibited the type of excise tax now explicitly allowed, *i.e.*, sales taxes. See *Callaway*, 211 Kan. at 650-51.

In 1970, the legislature enacted what was known as "the tax lid law," which suspended K.S.A. 12-139, 12-140, and 12-142. See K.S.A. 1971 Supp. 79-4414 (suspending K.S.A. 12-139, 12-140, and 12-142 until December 31, 1972); see also K.S.A. 1972 Supp. 12-169 (suspending K.S.A. 12-139, 12-140, and 12-142 until December 31, 1973). In place of those statutes, the legislature enacted K.S.A 1971 Supp. 79-4424, 79-4425, and 79-4426. Of particular relevance, K.S.A. 1971 Supp. 79-4424 then provided:

> "(a) No city shall impose an excise tax or tax in the nature of an excise, upon a sale or transfer of personal or real property, or the use thereof, or the rendering of a service without the governing body of such city having first submitted such proposition to and having received the approval of a majority of the electors voting thereon at any election authorized for such city by K.S.A. 1970 Supp. 79-4409, as amended, and the only such tax which may be enacted by a city is a retailers' sales tax which conforms to the requirements of this act."

23

This section has two primary parts. The first part is a general requirement that such taxes must be adopted with the approval of a majority of a city's electors. The second part—"the only such tax which may be enacted by a city is a retailers' sales tax which conforms to the requirements of this act"—is a limitation on the type of permitted taxes to sales only. What had been prohibited under the previous law—a sales tax—was now permitted, at least in the form of a retailers' sales tax. The previous prohibition "upon a sale or transfer of personal or real property, or the use thereof, or the rendering of a service" remained in place.

Meanwhile, K.S.A. 12-141's exceptions for contracting with a utility and licensing fees remained in effect. See K.S.A. 1971 Supp. 79-4414; K.S.A. 12-141.

In 1972 the legislature continued the 1970 suspension of statutes under the tax lid law and replaced K.S.A. 1971 Supp. 79-4424 with the following language:

> "No city shall levy or impose an excise tax or a tax in the nature of an excise, other than a retailers' sales tax levied under and subject to the restrictions and provisions of this act, upon the sale or transfer of personal or real property, or the use thereof, or the rendering of a service." K.S.A. 1972 Supp. 12-165.

The statute also contained three enumerated exceptions, two of which were identical to those in G.S. 1961 Supp. 12-141.

The practical effects of K.S.A. 1972 Supp. 12-165 were (1) to continue the general prohibition on excise taxes that had originated with G.S. 1961 Supp. 12-139, (2) incorporate the exceptions of G.S. 1961 Supp. 12-141, and (3) continue the permission for a retailers' sales tax that had originated with K.S.A. 1971 Supp. 79-4424. The 1972

24

provisions were designed to sunset on December 31, 1973. See K.S.A. 1972 Supp. 12-168.

In 1973, the legislature gave the basic framework of the 1972 legislation permanent effect. The new excise tax provision—K.S.A. 12-180 (Weeks)—was identical to K.S.A. 1972 Supp. 12-165.

In 1978, the legislature again addressed excise taxes. It repealed K.S.A. 12-180 (Weeks), see L. 1978, ch. 56, sec. 20, and adopted a new statute, which would become K.S.A. 12-194. See L. 1978, ch. 56, sec. 8. The only substantive change from K.S.A. 12-180 (Weeks) was extension of the prohibition to include counties as well as cities.

In 1982, the legislature amended K.S.A. 12-194 to add "a compensating use tax" to retailers' sales tax as explicitly permissible taxes. See L. 1982, ch. 66, sec. 2.

In 2002, the legislature added another exception to the enumerated list, see L. 2002, ch. 105, sec. 11, but that exception was short lived. The legislature deleted it from K.S.A. 12-194 in 2003. See L. 2003, ch. 120, sec. 14.

In 2006, K.S.A. 12-194 was amended to its present form. The legislature also restructured the statute slightly and added two new enumerated exceptions. See L. 2006, ch. 204, sec. 3.

Most important for today's case, the 2006 legislature deleted "upon the sale or transfer of personal or real property, or the use thereof, or the rendering of a service." See L. 2006, ch. 204, sec. 3. Before this amendment, the statute applied to "an excise tax or a tax in the nature of an excise . . . *upon the sale or transfer of personal or real property, or the use thereof, or the rendering of a service*." (Emphasis added.) K.S.A. 2005 Supp. 12-

25

194. After the amendment, the statute applied to "an excise tax or a tax in the nature of an excise." K.S.A. 2016 Supp. 12-194.

The parties and the panel each relied on *Callaway* in defining "excise tax." According to Mission, "'Kansas courts have defined an "excise tax" as one "imposed on the performance of an act, the engaging in an occupation or the enjoyment of a privilege."'" Based on this definition, Mission concludes that an excise tax is a "charge that is imposed on a *transactional basis*." For their part, Plaintiffs also quote the same passage from *Callaway*, but they focus on another statement from that decision:  "The term 'excise tax' has come to mean and include practically any tax which is not an ad valorem tax." *Callaway*, 211 Kan. at 651.

*Callaway* concerned an Overland Park ordinance that imposed an occupational tax of $.0035 per square foot of living space leased or subject to being leased on "'[p]ersons, firms, partnerships or corporations engaged in the business of owning and leasing or of leasing apartments, duplexes and all other rental properties'" within certain zoning classifications. 211 Kan. at 647.

The *Callaway* parties agreed the ordinance in question "was not submitted to the electors for their approval, was not a retailers' sales tax and if the general prohibition in the statute as to excise taxes covers the tax imposed by the ordinance it should be held invalid." 211 Kan. at 650. The court was concerned with possible conflict between the ordinance and K.S.A. 1971 Supp. 79-4424(a), stating, "'No city shall impose an excise tax or tax in the nature of an excise, upon a sale or transfer of personal or real property, or the use thereof, or the rendering of a service . . . .'" 211 Kan. at 651. If the tax imposed by the ordinance fell within this class of taxes, it would be invalid, because it did not qualify as a sales tax and was not passed in the prescribed manner. 211 Kan. at 650.

26

The court began its analysis by noting that "[t]he term 'excise tax' has come to mean and include practically any tax which is not an ad valorem tax." 211 Kan. at 651. An "ad valorem tax is a tax imposed on the basis of the value of the article or thing taxed," while an "excise tax is a tax imposed on the performance of an act, the engaging in an occupation or the enjoyment of a privilege." 211 Kan. at 651. In Kansas, "excise tax" had been used in caselaw to refer to occupation taxes, franchise or privilege taxes, and license fees. 211 Kan. at 651. The court said that, because "'excise tax' is but a general term covering the entire field,'" the limitations of the statute at issue could not be discerned from the legislature's use of that term alone. 211 Kan. at 651. The court thus turned to the more specific language—"upon a sale or transfer of personal or real property, or the use thereof, or the rendering of a service" to determine whether the statute's prohibition would reach Overland Park's occupational tax. 211 Kan. at 651.

The court noted that

"[t]he tax imposed by the Overland Park ordinance is upon engaging in a particular business, in this case leasing rental properties. The tax imposed, .0035 dollars per square foot of living space subject to being rented or leased, is an annual governmental exaction. *It is not due on a transactional basis for it is paid only once a year* whether the properties are rented or vacant and whether the same property is rented one or more times during a year." [Emphasis added.] 211 Kan. at 651.

This appears to be the portion of the *Callaway* opinion that Mission relies on for its argument that a tax qualifies as an excise tax only when it has a transactional tie. But the *Callaway* court was not using this language to define "excise tax." It was instead addressing the language of the statute that narrowed the group of excise taxes that would be prohibited.

The *Callaway* court then turned to case precedent for guidance.

27

In *Hampton v. City of Wichita*, 192 Kan. 534, 389 P.2d 757 (1964), the court had upheld an occupational tax imposed by Wichita when it faced a similar challenge. The controlling version of the statute was G.S. 1961 Supp. 12-139, which contained prohibition-restricting language identical to that in 79-4424—"upon a sale or transfer of personal or real property, or the use thereof, or the rendering of a service." The occupational tax in *Hampton* also was imposed on an annual basis. *Callaway*, 211 Kan. at 651-52. Although the tax was related to property, the ordinance at issue "'create[d] no property tax nor attempt[ed] to impose a tax on the sale or transfer of real or personal property or the use thereof, nor [did the] ordinance make the tax a charge upon any specific property; it is solely an occupational tax on the business conducted.'" *Callaway*, 211 Kan. at 652 (quoting *Hampton*, 192 Kan. at 536). The *Callaway* court applied *Hampton*'s reasoning and ruled that the Overland Park ordinance did not violate K.S.A. 1971 Supp. 79-4424(a).

In arriving at this conclusion, the *Callaway* court also rejected an argument that the ordinance's basis on square footage of living area rented and its imposition on the business of owning and leasing made the exaction an impermissible tax on the property or the inventory of a business. "'In determining the amount of a business or occupation tax, the city may use property as a measure, without imposing a tax on the property itself.'" 211 Kan. at 653 (quoting *Wichita Produce Co. v. City of Wichita,* 112 Kan. 28, 29, 209 P. 667 [1922]). Ultimately,

"the tax is imposed on an annual basis for engaging in a business and not on a transactional basis as prohibited in 79-4424(a), *supra*. Square footage of living area is used only to measure the amount of the occupation tax. There can be little question that the present tax is neither an ad valorem tax nor a sales, use or earnings tax." *Callaway*, 211 Kan. at 654.

The court concluded its analysis of whether the occupation tax was permissible by stating:

> "We are, however, of the opinion that the limitation upon the home rule power of a city to impose excise taxes (K.S.A. 1971 Supp. 79-4424) prohibits a city from imposing such taxes upon a transactional basis, *i.e.*, upon each sale, transfer or use of personal or real property or upon each rendition of service by a licensee or taxpayer." 211 Kan. at 655.

Again, this passage of the *Callaway* opinion does not define "excise tax" to require a transactional basis. Instead, the court was stating that the subset of excise taxes prohibited by the then-controlling version of the statute were those assessed on a transactional basis. Implicit in this pattern of analysis is the notion that there are other excise taxes assessed on a nontransactional basis.

In the case before us today, the Court of Appeals panel did not appear to recognize the essential distinction between defining "excise tax" generally and setting of the boundaries of the subset of statutorily prohibited excise taxes.

> "Both the *Callaway* and *Home Builders* [*Ass'n v. City of Overland Park*, 22 Kan. App. 2d 649, 921 P.2d 234 (1996)] courts permitted the questioned taxes because they were not taxing transactions. These interpretations were based on the working definitions adopted by the *Callaway* court for excise and ad valorem property taxes:
>
>> "'The term "excise tax" has come to mean and include practically any tax which is not an ad valorem tax. An ad valorem tax is a tax imposed on the basis of the value of the article or thing taxed. An excise tax is a tax imposed on *the performance of an act, the engaging in an occupation or the enjoyment of a privilege.*' *Callaway*, 211 Kan. at 651."
>> *Heartland Apartment*, 51 Kan. App. 2d at 714.

29

This statement misdirects. A tax on engaging in an occupation, for example, is not necessarily transactional. But, under the governing statute as worded before the 2006 amendment, a tax on engaging in an occupation would be prohibited if it were imposed on a transactional basis.

Despite this miscue, the panel ultimately reached the correct conclusion when it acknowledged that the 2006 amendment had removed all transactional bases as a way of determining if a tax is prohibited by law. The panel could have used more precise language, however. It said: "Simply put, the legislature removed all transactional bases as a way to decide if a tax is an excise tax prohibited by law." 51 Kan. App. 2d at 715. A more accurate synthesis of *Callaway* and the 2006 amendment would read: The legislature removed all transactional bases as a way to decide if an excise tax is prohibited by law; as a general rule, unless explicitly permitted, all excise taxes are now prohibited.

Mission relies on the panel's miscue to argue that the panel incorrectly enlarged the definition of excise tax. In its view, the definition of excise tax from *Callaway* still should be good law. Strictly speaking, Mission is correct. But this point does not lead where Mission would like us to go. The 2006 amendment did nothing to alter what *Callaway* described as excise taxes. Yet, because the statute in effect when *Callaway* was decided did not prohibit all excise taxes, the *Callaway* court was concerned only with discerning which excise taxes were prohibited. The panel correctly concluded that the 2006 amendment altered the breadth of the statutory prohibition. As the panel said, "What was once permitted is now prohibited." *Heartland Apartment*, 51 Kan. App. 2d at 716. The 2006 amendment did remove all transactional bases, but that affected the basis for prohibition rather than the general definition of "excise tax."

30

This brings us back to the question we must face: Is the TUF an excise tax? *Callaway* did not address whether the ordinance at issue in that case levied an excise tax; it merely held that it did not levy a *prohibited* excise tax. But two statements from *Callaway* are nevertheless instructive for us here: "The term 'excise tax' has come to mean and include practically any tax which is not an ad valorem tax." *Callaway*, 211 Kan. at 651. And "[a]n excise tax is a tax imposed on the performance of an act, the engaging in an occupation or the enjoyment of a privilege." 211 Kan. at 651.

These observations from *Callaway* are in general accord with that from other jurisdictions and legal authorities. See *United States v. Wells Fargo Bank*, 485 U.S. 351, 355, 108 S. Ct. 1179, 99 L. Ed. 2d 368 (1988) (estate tax a form of excise tax; "Underlying this doctrine is the distinction between an excise tax, which is levied upon the use or transfer of property even though it might be measured by the property's value, and a tax levied upon the property itself."); *Board of County Comm'rs of Kay County, Okla. v. Federal Housing Finance Agency*, 754 F.3d 1025, 1030 (D.C. Cir. 2014) ("excise taxes may be measured by the property's value, but they are levied upon its use or transfer and not upon its existence"); Black's Law Dictionary 684 (10th ed. 2014) (excise "tax imposed on the manufacture, sale, or use of goods [such as a cigarette tax] or on an occupation or activity [such as a license tax or an attorney occupation fee]").

Still other jurisdictions focus more on the taxing of an "act," when compared with *Callaway*. For example, in *Steven Banks v. Heineman*, 286 Neb. 390, 396-97, 837 N.W.2d 70 (2013), the Nebraska Supreme Court noted:

> "An excise tax is a tax imposed on the manufacture, sale, or use of goods or on an occupation or activity, and is measured by the extent to which a privilege is exercised by the taxpayer, without regard to the nature or value of the taxpayer's assets. *An excise tax is imposed upon the performance of an act*. We have also stated that an excise tax includes taxes sometimes designated by statute or referred to as 'privilege taxes,' 'license

31

taxes,' 'occupation taxes,' and 'business taxes.' In contrast, a property tax is levied on real or personal property, with the amount of the tax usually dependent upon the value of the property." (Emphasis added.)

Although the Nebraska definition states that an excise tax is imposed on the performance of an act, this does not necessarily make it a transaction-based tax. Rather it appears that the *Steven Banks* court used "act" in a broader sense, to include things such as a tax on the privilege of the "act" of engaging in an occupation.

As the authorities cited above also illustrate, courts often are called upon to contrast excise taxes with property taxes. In *Wells Fargo*, the United State Supreme Court addressed a provision that exempted certain public housing entities from "all taxation." The Court began by noting that generally "an exemption of property from all taxation had an understood meaning:  the property was exempt from *direct* taxation, but certain privileges of ownership, such as the right to transfer the property, could be taxed." *Wells Fargo*, 485 U.S. at 355. A "direct tax" is a "tax that is imposed on property, as distinguished from a tax on a right or privilege. A direct tax is presumed to be borne by the person on whom it is assessed, and not 'passed on' to some other person. Ad valorem and property taxes are direct taxes." Black's Law Dictionary 1685 (10th ed. 2014); *cf.* Black's Law Dictionary 1686 (10th ed. 2014) (indirect tax a "tax on a right or privilege, such as an occupation tax or franchise tax"). Underlying the doctrine of limiting an exemption for "all taxes" to direct taxes was the distinction "between an excise tax, which is levied upon the *use or transfer of property* even though it might be measured by the property's value, and a [direct] *tax levied upon the property itself*." (Emphases added.) 485 U.S. at 355.

The *Callaway* court implicitly acknowledged this distinction between property taxes and excise taxes when it noted that excise taxes include practically all taxes except

32

ad valorem taxes. At the time of *Callaway*, the overwhelming majority of property taxes were ad valorem taxes, but our court would be called upon later to address a non-ad valorem property tax.

In *Von Ruden v. Miller*, 231 Kan. 1, 6, 642 P.2d 91 (1982), the court considered an intangibles tax that required payment of 3 percent of gross earnings from intangible property such as "money, notes, and other evidences of debt." The plaintiff argued that this tax violated Article 11, section 1's uniform and equal clause. In contrast, the defendant, the Reno County treasurer, argued it was a permissible excise tax. At the outset of its analysis, the court noted that "[a]lthough *Callaway* noted, as a practical matter, that an excise tax includes practically any tax which is not an ad valorem tax, this is not invariably true." 231 Kan. at 8. "The Kansas intangibles tax fits neither the definition of an ad valorem tax nor an excise tax, which includes income taxes, defined in article 11, § 11, and K.S.A. 79-3201 *et seq*., as a tax on net income." 231 Kan. at 8. Ultimately, the court decided the intangibles tax was a type of property tax. 231 Kan. at 8.

Mission relies on *Von Ruden* in an attempt to undercut the assertion in *Callaway* that excise taxes include virtually all taxes other than an ad valorem tax. Again, strictly speaking, Mission's assertion has some validity. As *Von Ruden* illustrates, there are taxes other than ad valorem and excise. But, also again, Mission's point does not lead where Mission would like us to go. *Von Ruden* actually undercuts the *Callaway* court's use of "ad valorem tax" rather than the more accurate "property tax." The grouping of taxes into two general types, as implied by *Callaway*, appears to remain valid. But the more precise names for the two groupings are property taxes and excise taxes, rather than ad valorem taxes and excise taxes.

Mission also tries to persuade us that the TUF is not an excise tax without identifying what the TUF is, if not an excise tax. Without calling the TUF a property tax, Mission highlights the fact that both "the Attorney General and Plaintiffs contend that 'the TUF is assessed and levied based upon *ownership* of property.'" Mission notes that

> "*ownership* of property does <u>not</u> fall within any definition of 'excise tax' advanced by anyone in this litigation, much less within any Kansas precedents involving an excise tax. Specifically, ownership of property is <u>not</u> the performance of any act. Nor is it engaging in any occupation. Nor is it enjoyment of any 'privilege.' Indeed, the TUF is assessed on all developed property regardless of whether the property is used or enjoyed at all."

This argument ignores the distinction between a tax levied on the property itself and a tax "levied upon the use or transfer of property." See *Wells Fargo*, 485 U.S. at 355. This court acknowledged this distinction in *Callaway* when addressing the plaintiffs' argument that taxation based on the square footage of living area meant the tax inevitably qualified as property tax. 211 Kan. at 653. The court noted that "[t]he use of square footage of living area rented is merely a means of measuring the amount of the occupational tax to be collected annually," rather than making the tax one on the property itself. 211 Kan. at 653; see also *Wichita Produce Co.*, 112 Kan. at 29 ("'In determining the amount of a business or occupation tax, the city may use property as a measure, without imposing a tax on the property itself.'").

With all of the foregoing discussion in mind, and applying *Callaway*'s definition that an "excise tax is a tax imposed on the performance of an act, the engaging in an occupation or the enjoyment of a privilege," we conclude that the TUF is an excise tax. The TUF is a tax on real property owners based on the use of their property, rather than a tax on the property itself. See Mission City Code §145.070 (TUF based on "direct and indirect use of or benefit derived from the use of public streets, bicycle lanes and sidewalks generated by the developed property"); *cf. Wells Fargo*, 485 U.S. at 355

34

(excise tax levied on use or transfer of property). Black's defines "enjoyment" as the "[p]ossession and use, esp. of rights or property." Black's Law Dictionary 647 (10th ed. 2014). Based on this definition, a tax based on how a property is used and developed, as the TUF is, falls within *Callaway*'s definition of an excise tax because it is a tax on "the enjoyment of a privilege." The privilege in this case being the benefits of property ownership beyond the ownership itself.

Mission's TUF is an excise tax that does not meet any of the exceptions in K.S.A. 12-194. Mission is thus prohibited from levying the TUF.

CONCLUSION

The decision of the Court of Appeals is affirmed. The district court's summary judgment in favor of the City of Mission is reversed, and this case is remanded to the district court for the entry of summary judgment in favor of the moving plaintiffs on the issue of whether the TUF is a prohibited excise tax and for any other proceedings the district judge deems necessary to full resolution of the parties' claims. See *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 910, 220 P.3d 333 (2009).